# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>PAUL L. BURMAN, <u>et</u> <u>al.</u>,                    )<br>                                      )<br>    Plaintiffs,                     )<br>                                      )<br>    v.                              )<br>                                      )<br>PHOENIX WORLDWIDE                     )<br>INDUSTRIES, INC., <u>et</u> <u>al.</u>,               )<br>                                      )<br>    Defendants.                     )<br>_____ ) | Civil Action No. 04-1276 (RBW) |

## <u>MEMORANDUM OPINION</u>

The plaintiffs bring this action alleging "statutory securities fraud, common law fraud and misrepresentation, negligent misrepresentation, breach of fiduciary duty and negligence." First Amended Complaint ("Compl.") at 1.[1] Currently before the Court is defendant Phoenix Worldwide Industries, Inc. ("Phoenix") and Dr. J. Al Esquivel Shuler ("Shuler")'s Rule 12(b)(6) Motion to Dismiss Amended Complaint and Alternative Rule 12(E) Motion for a More Definitive Statement ("Defs.' Mot.") and the plaintiffs' opposition thereto.[2] For the reasons set

---

[1]  Based upon the papers thus far submitted to this Court, it is clear that this is a highly contentious litigation. Despite the apparent animosity between the parties, counsel are reminded that they are expected to treat each other, and every other individual involved in this litigation, with "dignity, respect and civility, both in court and in out-of-court conference, meeting and discovery proceedings." Judge Walton's General Order and Guidelines for Civil Cases at 1, <u>available at</u> http://www.dcd.uscourts.gov/rbw-general-civil-order.pdf. This includes civility in the papers submitted to this Court. The papers submitted by the defendants do not demonstrate the dignity and respect the Court expects of litigants appearing before it. <u>See, e.g.</u>, Def.'s Reply at 7 ("Defendants agree that a review of the Amended Complaint is a 'painstaking' endeavor."); 18 ("If Plaintiffs do not appear to understand their own claims, how can Defendants?"); 29 ("Defendants are not obligated to teach Plaintiffs how to properly plead their complaint. However, we will give Plaintiffs a clue."). Such condescending invectives do nothing to advance a party's position. As members of the Bar, counsel surely know how to vigorously advance their respective party's position without being disrespectful or mean spirited. The Court will look with disfavor on any further circumstances that warrant such a reminder, and if warranted, will take appropriate action to sanction such behavior.

[2]  The following papers have been submitted in connection with this motion: (1) defendant Phoenix

(continued...)

forth below, this Court grants in part, and denies in part the defendants' motion.[3]

## I.   Factual Background

Shuler is the founder of Phoenix and at all relevant times has served as its President,

Chief Executive Officer, Chairman of the Board of Directors, and majority stockholder.  Compl.[4]

¶ 6.  In 2001, the Phoenix Board of Directors included, among others, Shuler's wife, his brother,

and Charles Levy.  Id. ¶ 19.  These three individuals, along with Shuler, constituted a majority of

the Board of Directors.  Id.  On August 1, 2001, Phoenix issued a Private Placement Offering

Memorandum ("PPM") to sell 2,000,000 shares of Phoenix common stock to "accredited

investors" pursuant to Regulation D, Rule 506 of the Securities Act of 1933.[5]  Id. ¶ 20.  Under

the PPM, Phoenix sought investments of ten million dollars at $5.00 per share.  Id. ¶ 21.

According to the plaintiffs, Phoenix needed "substantial capital infusions" as it was in arrears

and in default on approximately a $2.6 million debt obligation to First Union Bank.  Id.

Shortly after the PPM was issued, the plaintiffs became aware of the investment

opportunity.  Namely, in August 2001, Paul Burman was approached by an investment advisor,

---

[2](...continued)
Worldwide Industries, Inc. and Dr. J. Al Esquivel Shuler's Memorandum in Support of Motions in Opposition to
Plaintiffs' Amended Complaint ("Defs.' Mem."); (2) the Plaintiffs' Memorandum of Points and Authorities in
Opposition to Defendant Phoenix Worldwide Industries, Inc. and Dr. J. Al Esquivel Shuler's Rule 12(b)(6) Motion
to Dismiss Amended Complaint and Alternative Rule 12(e) Motion for More Definite Statement ("Pls.' Opp'n"); and
(3) the Reply of Defendants Phoenix and Shuler to Plaintiffs' Opposition to Rule 12(b)(6) Motion to Dismiss
Amended Complaint and Alternative Rule 12(E) Motion for a More Definite Statement ("Defs.' Reply").

[3]  As will be discussed throughout this opinion, portions of the plaintiffs' complaint are defective.  Rather
than dismiss those counts, the Court will, where appropriate, grant the plaintiffs' request for leave to file an amended
complaint.  Pls.' Opp'n at 44 n.42.  As another member of this Court has found, "[t]his circuit requires trial courts to
grant leave to amend liberally, especially when a complaint is [subject to] dismiss[al] for pleading deficiencies."  In
re U.S. Office Prods. Co. Sec. Litig., 251 F. Supp. 2d 77, 106 (D.D.C. 2003).

[4]  The Court uses the term "Compl." throughout this opinion to reference the First Amended Complaint.

[5]  Despite citing to Rule 506, it appears that the term "accredited investors" is defined in Rule 501(a).  See,
e.g., In re Integrated Res. Real Estate Ltd. P'ship Sec. Litig., 815 F. Supp. 620, 651 n.20 (S.D.N.Y. 1993).

George Schwelling, who advised him of the opportunity to invest in Phoenix.  Id. ¶ 24.  Burman

later shared that information with Robert Warriner and Jay Zawatsky, the investment manager for

plaintiff Ingersoll & Bloch.  Id. ¶¶ 24-25.  Charles Levy, a director and shareholder in Phoenix,

advised Sylvia Rolinski of the Phoenix opportunity.  Id. ¶ 26.

The basis for the present action stems from a number of alleged misrepresentations that

occurred during this solicitation period (September 2001 through January 2003) for the purchase

of Phoenix stock.  Id. ¶¶ 28, 31.  In the plaintiffs' complaint, they divide the various alleged

misrepresentations into two distinct categories—contract misrepresentations and IRS

misrepresentations.  The Court will do the same here.

### (A)    The Alleged Contract Misrepresentations

In Addendum E to the August 2001 PPM ("Addendum E"), Phoenix claimed risk

adjusted gross revenue for the three year period following the issuance of the PPM totaling

$2,885,087,858.  Id. ¶ 32.  Addendum E adjusted and analyzed Phoenix's scheduled gross

income pursuant to a delineated risk assessment, applied to a set of identified product sales,

ranging from a high of 100% to a low of 5%.  Id. ¶ 33.  According to the plaintiffs, Addendum E

represented that a total of $39 million in gross revenue was "a 100% certainty for Years 1

through 3; an additional total of $14,500,000 was a 95% certainty in Year 2; an additional

$243,743,675 was a 90% certainty in Years 1 and 2; and, an additional $189,029,044 was an

80% certainty in Year 1."  Id. ¶ 37.  In addition to Addendum E, on September 3, 2001, Phoenix

prepared a written statement ("September 2001 Contracts Statement"), which purported to set out

in a color-coded format various "Contracts in Progress."  Id. ¶ 38.  In this September 2001

Contracts Statement, seven contracts were highlighted in blue, representing "signed contracts,"

nine were highlighted in yellow, representing "contracts in process of being signed," and five were highlighted in green, representing "contracts pending." Id. ¶ 39.  The plaintiffs opine, however, that even though the Contracts Statements have contracts highlighted in Blue, representing signed contracts, many were in fact not signed ("the Blue Contract Misrepresentations").

The plaintiffs contend that the representations made to the various plaintiffs, including the September 2001 Contracts Statements (and subsequent Contracts Statements), induced them to invest in Phoenix.  For example, in February 2002, Levy purportedly represented to Rolinski that Phoenix had procured a contract with the Immigration and Naturalization Service—now the United States Citizenship and Immigration Services—to install sensors along the southern border of the United States ("the Border Contract").  Id. ¶ 40.  Relying upon this information, which the plaintiffs now represent was a misrepresentation, Rolinski purchased 2,000 shares of Phoenix stock.  Id. ¶¶ 40-42.

On May 15, 2002, Phoenix updated the 2001 Contracts Statement ("May 2002 Contracts Statement").  Id. ¶ 43.  The May 2002 Contracts Statement again used a color-coded system and identified twelve contracts that had been signed; sixteen that were in the process of being signed; and five that were pending.  Id. ¶¶ 43-44.  At the end of May 2002, Zawatsky received a copy of the May 2002 Contracts Statement, along with the PPM, Addendum E, and the September 2001 Contracts Statement.  Id. ¶ 46.  After receiving these documents, Zawatsky and Levy spoke on the telephone.  Id. ¶ 47.  During that conversation, Levy represented that the "blue line items" were "done deals," and they represented "the minimum amount of sales revenue Phoenix was assured to generate over the next three years."  Id. ¶ 49.  In addition, Levy asserted that Phoenix

4

anticipated going public by January 2004, at which time investors could divest.  Id. ¶ 50.  In the

interim, however, Levy noted that investors would receive dividends approximately equal to their

$5.00 per share investment as a result of the cash flow generated by the various contracts.  Id.

Based upon this information, which the plaintiffs now assert was false, Zawatsky, on behalf of

Ingersol & Bloch, purchased 25,000 shares of Phoenix common stock at $5.00 per share.  Id. ¶¶

51-55.  Also, on behalf of Ingersol & Bloch, Zawatsky later purchased an additional 25,000

shares of Phoenix common stock based upon the May 2002 Contracts Statement, after Levy

informed him that Phoenix had secured a Department of Defense ("DoD") contract.  This

contract would purportedly result in Phoenix paying investors a dividend at nearly the $5.00 per

share purchase price by December 2002.  Id. ¶ 59.  Zawatsky purchased an additional 100,000

shares on July 22, 2002, relying on both the May 2002 Contracts Statement and various

statements allegedly made by Shuler to Zawatsky during his 2002 inspection of Phoenix's

Florida facilities in conjunction with the DoD contract.  Id. ¶¶ 60-62.  Rolinski also made an

additional purchase of 900 shares of Phoenix common stock based upon the May 2002 Contracts

Statement and purported representations concerning the procurement of the DoD contract.  Id. ¶¶

57-58.

On August 2, 2002, Phoenix issued an August 2002 Contracts Statement.  Id. ¶ 63.  The

August 2002 Contracts Statement again used a color-coded system and identified fifteen

contracts that had been signed; sixteen that were in the process of being signed; and five that

were pending.  Id.  On January 15, 2003, Rolinski purchased an additional 2000 shares of

Phoenix common stock at $10.00 per share based upon the August 2002 Contracts Statement and

representations allegedly made by Levy to Rolinski that Shuler had gone to Egypt and procured a

billion dollar contract with that country.  Id. ¶¶ 66-67.   On August 27, 2002, based upon information received from Levy regarding the procurement of the Egypt contract, Robert Warriner purchased 5000 shares of Phoenix common stock.  Id. ¶¶ 70-73.  The plaintiffs claim, however, that the Egypt contract was never actually procured.  Id.

Paul Burman also invested in Phoenix based upon alleged misrepresentations.  Id. ¶¶ 74-86.  Specifically, based upon representations that are purported to have been made to Burman by Shuler and Levy when Burman was inspecting the Phoenix facilities, the 2001 September Contracts Statement, the August 2002 Contracts Statement, and the representations concerning the procurement of the billion dollar contract with Egypt, all of which the plaintiffs contend were false, Burman purchased 61,400 shares of Phoenix's common stock in twelve successive transactions over a twelve month period.  Id. ¶¶ 74-76.

**(B)     The Alleged IRS Misrepresentations**

The plaintiffs allege that in connection with their purchase of the Phoenix common stock, in addition to the already discussed documents, they were provided with and relied upon audited financial statements prepared by Rachlin, Cohen & Holtz, LLP ("Rachlin").  Id. ¶¶ 87, 96.  The 2001-2002 financial statement allegedly contained a number of "notes," which the plaintiffs contend were misrepresentations that induced them into purchasing Phoenix common stock.  Id. ¶ 88.  Two of these notes, Note 10 and Note 13, indicated that Phoenix had been in arrears in its payment of payroll taxes, but that "[i]n August 2002, the Company paid all current and overdue payroll taxes."  Id.  When further quieried by Zawatsky about the arrearages in May 2002, Levy purportedly reiterated that the unpaid taxes had in fact been paid.  Id. ¶ 89.  In July 2002, the plaintiffs' contend that Shuler also told Zawatsky that the payroll taxes had been paid.  Id. ¶ 90.

The plaintiffs claim, however, that these arrearages were not paid and that the Internal Revenue Service placed a tax lien on Phoenix's real property until the payroll taxes were paid in full.  Id. ¶ 91.  Moreover, the plaintiffs assert that Rachlin should have disclosed these delinquencies in the audited financial statements they completed for Phoenix.  Id. ¶ 94.

     **(C)**    **This Action**

The plaintiffs commenced this action on July 29, 2004.  Following a round of initial briefing, the plaintiffs filed an amended complaint alleging eight separate claims.  Id. ¶¶ 97-148.  The plaintiffs assert five substantive claims against Phoenix and Shuler:  (1) violations of section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (2) common law fraud, deceit, and misrepresentation; (3) negligent misrepresentation; (4) breach of fiduciary duties; and (5) violation of state Blue Sky laws.  Id. ¶¶ 97-136.  In addition, the plaintiffs ask this Court to appointment a receiver for the corporation, id. ¶¶ 137-38, and seek various forms of post-judgment injunctive relief, id. ¶¶ 139-42.  Finally, the plaintiffs assert one claim of negligence against Rachlin.  Id. ¶¶ 143-48.  Defendants Phoenix and Shuler seek dismissal of the claims against them pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), or for a More Definite Statement pursuant to Rule 12(E).  The Court will address each of the defendants' arguments in turn.

## II.   Standard of Review

Rule 9(b) requires that a pleader state with particularity the circumstances constituting fraud or mistake.  Fed. R. Civ. P. 9(b).  "Rule 9(b)'s particularity requirement ensures that the opponent has notice of the claim, prevents attacks on his reputation where the claim for fraud is unsubstantiated, and protects against a strike suit brought solely for its settlement value."  In re

U.S. Office Prod. Sec. Litig., 326 F. Supp. 2d 68, 73 (D.D.C. 2004).  Thus, because Rule 9(b) is "chiefly concerned with the elements of fraud, [and] the circumstances that the claimant must plead with particularity include matters such as the time, place, and content of the false misrepresentations, the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud."  Id. (citing United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 551-52 (D.C. Cir. 2002)).  Accordingly, the plaintiffs must plead the "who, what, when, where, and how" with respect to the circumstances of the fraud.  DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).  Thus, Rule 9 requires more than "pleadings [based] on information and belief," but rather "require[s] an allegation that the necessary information lies within the defendant's control" and "such allegations must also be accompanied by a statement of the facts upon which the allegations are based."  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994).  "Rule 9(b)'s particularity requirement does not abrogate Rule 8's general requirement that a pleading contain a short and plain statement of the claim, and that each averment be simple, concise, and direct."  In re U.S. Office Prod. Sec. Litig., 326 F. Supp. 2d at 74.  On the other hand, Rule 9(b) requires the pleader to provide a higher degree of notice by adequately alleging all the elements for the cause of action.  Id.  Finally, "[c]onclusory allegations that a defendant's actions were fraudulent and deceptive are not sufficient to satisfy 9(b)."  Shekoyan v. Sibley Int'l Corp., 217 F. Supp. 2d 59, 73 (D.D.C. 2002).

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiffs and must grant the plaintiffs the benefit of all inferences that can be derived from the alleged facts.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Barr v.

<u>Clinton</u>, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing <u>Kowal</u>, 16 F.3d at 1276).   "[T]he

complaint need only set forth 'a short and plain statement of the claim,' Fed. R. Civ. P. 8(a)(2),

giving the defendant fair notice of the claim and the grounds upon which it rests." <u>Kingman Park

Civic Ass'n v. Williams</u>, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing <u>Conley</u>, 355 U.S. at 47).

"Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and

the other pretrial procedures established by the Rules to disclose more precisely the basis of both

claim and defense and to define more narrowly the disputed facts and issues." <u>Conley</u>, 355 U.S.

at 47-48.   While many well-plead complaints are conclusory, the Court need not accept

inferences or conclusory allegations that are unsupported by the facts set forth in the complaint.

<u>Kowal</u>, 16 F.3d at 1276.   Moreover, in deciding whether to dismiss a claim under Rule 12(b)(6),

the Court can only consider the facts alleged in the complaint, documents attached as exhibits or

incorporated by reference into the complaint, and matters about which the Court may take

judicial notice.   <u>EEOC v. St. Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624-25 n.3 (D.C. Cir.

1997).   A court may dismiss a claim pursuant to Rule 12(b)(6) only if the defendant can

demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46.

### III.   Analysis

In their dismissal motion, the defendants claim that each count of the plaintiffs' complaint

is defective.   Defs.' Mem. at 2-3.[6]

---

[6]  The parties throughout their papers cite to Maryland, District of Columbia and Florida law in support of
their various positions.  However, the parties provide little support for the applicability of a particular jurisdiction's
law.  To the extent that the parties disagree on what jurisdiction's law applies to particular claims, this Court finds it
unnecessary to engage in a conflicts of law analysis because, as noted in the various sections that follow, the Court's
conclusions would not be altered regardless of which jurisdiction's law is applied.

**(A)      The Plaintiffs' Securities Fraud Claim**

Count one of the plaintiffs' complaint alleges violations of Rule 10b-5 of the Code of

Federal Regulations, 17 C.F.R. § 240.10b (2005), promulgated pursuant to Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b) (2000).  Compl. ¶¶ 97-105.  Rule 10b-5 "prohibit[s] fraudulent

activities in connection with securities transactions."  Novak v. Kasaks, 216 F.3d 300, 305 (2d

Cir. 2000).  And section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security . . . any
> manipulative or deceptive device or contrivance in contravention of such rules and
> regulations as the Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

15 U.S.C. § 78j(b).   Rule 10b-5 is section 10(b)'s implementing regulation, and it provides that

it is unlawful, in the connection with the purchase or sale of securities,

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact
> necessary in order to make the statements made, in the light of the circumstances under
> which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate
> as a fraud or deceit upon any person, in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5.  "To state a claim for securities fraud under Rule 10b-5, a plaintiff must

allege that the defendant knowingly or recklessly made a false or misleading statement of

material fact in connection with the purchase or sale of a security, upon which [the] plaintiff

reasonably relied, proximately causing his injury."  Kowal, 16 F.3d at 1276.  Thus,

> a plaintiff must allege (1) a material misstatement or omission, (2) made with scienter (an
> intent to deceive), (3) made in connection with the purchase or sale of a security, (4)
> furthered by the use of the mails or a national securities exchange, and (5) upon which
> plaintiff detrimentally relied.

10

IDT Corp. v. eGlobal, Inc., 140 F. Supp. 2d 30, 33 (D.D.C. 2001) (citing Kowal, 16 F.3d at

1276).   In addition, the Supreme Court's recent decision in Dura Pharms., Inc. v. Broudo, ____

U.S. ____, 125 S.Ct. 1627 (2005) makes it clear that a plaintiff must also plead economic loss

and "'loss causation,' i.e., a causal connection between the material misrepresentation and the

loss." Id. at 1631.   When stating a claim under Rule 10b-5, the claimant must satisfy Rule 9(b)'s

particularity requirement and state the circumstances constituting fraud with particularity.

Kowal, 16 F.3d at 1277-79.

      In an attempt to prevent "abusive and meritless lawsuits," Congress passed the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78b et seq. (2000).   H.R.

Conf. Rep. No. 104-369 at 31 (1995).   The PSLRA amended the Securities Exchange Acts of

1933 and 1934 to require that "with respect to each act or omission alleged to violate the [the

Securities Exchange Act, the complaint must] state with particularity facts giving rise to a strong

inference that [a] defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)

(emphasis added).   "Courts have described § 78u-4(b)(2) as requiring that a plaintiff must plead

with particularity facts that establish a 'strong inference' of scienter."   In re U.S. Office Prod.

Sec. Litig., 326 F. Supp. 2d at 75 (citing Levitt v. Bears Stearns & Co., Inc. , 340 F.3d 94, 104

n.2 (2d Cir. 2003); In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 19 (D.D.C. 2000)).   However,

as a member of this Court noted, "[t]here is no consensus among the courts as to how a 'strong

inference' of scienter may be established, and our Circuit has yet to rule on the issue."   In re

Baan, 103 F. Supp. 2d at 19.   Based on this legal framework, the defendants seek dismissal of the

plaintiffs' securities fraud claim alleging that the plaintiffs have failed to properly state a claim

upon which relief may be granted. Defs.' Mem. at 15-30.   The defendants raise a number of

arguments in support of their contention that the plaintiffs' securities fraud claim is deficient, each which will now be addressed below.[7]

(1)     Have the Plaintiffs Pled Their Securities Fraud Claim with Sufficient Specificity?

The defendants contend that the plaintiffs have failed to plead with specificity the "who, what, when, and where" of the alleged "Blue Contract Misrepresentations."[8]  Defs.' Mem. at 22-23.  Specifically, the defendants opine that the plaintiffs' complaint merely offers "vague generalisms"about the Blue Contract Misrepresentations and does not specify exactly which contracts were allegedly misrepresented.  Id. at 23.  In addition, the defendants allege that the basis for the Blue Contract Misrepresentations are "either not readily apparent from the review of

---

[7]  In addition to the arguments discussed in this opinion, the defendants also claim that the plaintiffs' securities fraud claim should be dismissed as untimely.  Defs.' Mem. at 15-17.  However, as the defendants later concede in their reply memorandum, this argument has no merit.  Defs.' Reply at 11.

The defendants also opine that because the allegations of misrepresentation are internally contradictory within the original complaint itself and also with the amended complaint, and because the plaintiffs' have incorporated the original complaint into the amended complaint, the fraud counts in the amended complaint should be dismissed.  Defs.' Mem. at 19-20.  This argument has no merit.  First, contrary to the defendants' argument, the plaintiffs have not "specifically indicated that the Amended Complaint does not supplant the original complaint" and that the original complaint is incorporated into the amended complaint.  Defs.' Mem. at 17.  Rather, the plaintiffs have clearly filed an amended complaint that was intended to replace the original complaint.  This is illustrated by their representation that the amended complaint was filed to "add additional claims against the Phoenix Defendants, . . . seek additional remedies and relief . . .[and] add[] additional detail."  Memorandum of Points and Authorities in Support of Consent Motion for Leave to File a First Amended Complaint at 2.  The defendants attempt to string together phrases from various pleadings to argue that the original complaint is still before the Court as part of the amended complaint has simply no merit and finds no support in the actual pleadings.  However, "[w]hen a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated." Smiths Am. Corp. v. Bendix Aviation Corp, 140 F. Supp. 46, 53-54 (D.D.C. 1956).  Thus, although it is potential evidence and may prove useful to the defendants at some point, the superceded portions of the original complaint have no bearing on the motions currently before the Court.  And while the Court recognizes that the original complaint may have utility as evidence at a trial or on summary judgment motions, Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 707 (2d Cir. 1989), the mere fact that there may be inconsistences between what it indicated and what is reflected in the amended complaint is not a basis to dismiss a claim at this stage of the litigation.  In fact, at this stage, the Court must view the facts in the amended complaint in the light most favorable to the plaintiffs.  Thus, even assuming that there are internal inconsistences in the original complaint, or inconsistences between the original complaint and the amended complaint, the Court must views those inconsistences in the light most favorable to the plaintiffs.  Accordingly, they do not provide support for dismissal of any count of the amended complaint.

[8]  The defendants do not allege that any other transaction has not been sufficiently pled, thus this Court only need address the alleged "Blue Contract Misrepresentation" in this section.

the cited material or contradicted by such material."  Id.  Accordingly, the defendants contend

that the plaintiffs have failed to plead these allegations with sufficient particularity.  Id.

The plaintiffs, relying on Rogers v. Cisco Sys. Inc., 268 F. Supp. 2d 1305, 1310-11 n.10

(N.D. Fla. 2003), assert that the securities fraud claim has been sufficiently pled. Pls.' Opp'n at

27-28.  A complaint alleging securities fraud complies with Rule 9(b) if it sets forth

> (1) precisely what statements were made in what documents or oral representations or
> what omissions were made and (2) the time and place of each such statement and the
> person responsible for making (or, in the case of omissions, not making) same, and (3)
> the content of such statements and the manner in which they misled the plaintiff, and (4)
> what the defendants obtained as a consequence of the fraud.

Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)

(citation omitted).  The Blue Contract Misrepresentations refer to alleged misrepresentations

contained in the various Contracts Statements concerning the contracts that had been signed, and

statements made by Levy regarding such contracts.  Compl. ¶¶ 48-49.  A careful review of the

plaintiffs' complaint makes clear that it satisfies the requisite pleading standard.

First, the complaint identifies what statements were allegedly made.  For example, the

complaint identifies a statement by Levy that the contracts highlighted in blue on the Contracts

Statements were "'done deals' with a 100% probability of performance."  Compl. ¶ 49.  In

addition, the complaint indicates that the contracts highlighted in Blue were represented to be

"signed contracts."  Id. ¶ 39.  The complaint also provides the exact or approximate dates when

each of the documents that purport to advance the Blue Contract Misrepresentations were

received by the plaintiffs.  Id. ¶¶ 45-46, 56, 64, 75, 77.  And, the complaint identifies when

statements were made to further the alleged Blue Contract Misrepresentations, who made those

statements (Levy or Shuler), and the content of those statements.  Id. ¶¶ 40, 46-49, 57, 59, 66, 71,

74, 78.[9]  In addition, the complaint identifies how those statements misled the

plaintiffs—inducing them to purchase Phoenix common stock.  Id. ¶¶ 40-42, 51-55, 57-59, 66-

67, 70-76.  Finally, it is clear from the complaint what the defendants' gained—financial

investment in a corporation that was in need of funds.  Id. ¶¶ 21-22.  Based on the foregoing

factors, the Court concludes that the plaintiffs have pled with sufficient specificity the facts

underlying the alleged Blue Contract Misrepresentations.[10]  See, e.g., Rogers, 268 F. Supp. 2d at

1311-12.

> (2)     Have the Plaintiffs Sufficiently Pled Reliance?

Recently, another member of this Court noted that "District of Columbia courts have

ruled that no reasonable trier of fact could conclude that a plaintiff reasonably relied on oral

representations contradicted by express written provisions."  In re U.S. Office Prods. Co. Sec.

Litig., 251 F. Supp. 2d 77, 105 (D.D.C. 2003).  Relying on this ruling, the defendants posit that

because the Contracts Statements, Compl., Ex. 2, "show that there was either little or no income

from the 'Blue Contracts', the 'Egypt Contract', or the 'Border Contracts,'" they contradicted

statements allegedly made by Levy regarding immediate revenue that would be generated from

these contracts.  Defs.' Mem. at 24-25.  Essentially, the defendants contend that the plaintiffs

should have been able to detect the alleged fraud, thus they should not have relied upon the

---

[9]  Although many of these statements implicate purported misrepresentations made regarding other contracts, including the alleged representations about the procurement of a DoD contract and the contract with Egypt, these statements provide support for and further the alleged Blue Contract Misrepresentations contained in the various Contracts Statements.

[10]  The defendants argue in the alternative that the Contracts Statements do not support the plaintiffs' position because they "specifically made a distinction between contracts and orders."  Defs.' Mem. at 23.  Upon close review of the Contracts Statements, Compl., Ex. 2, no such distinction is apparent to this Court.  The Contracts Statements list a number of categories, none which are "orders."  Nonetheless, this alternative argument has no merit, as the Court, at this stage of the litigation, must view the evidence in the light most favorable to the plaintiffs.  Conley, 355 U.S. at 45-46.

14

statements and documents provided to them.  This argument has no merit as the Contracts

Statements do not necessarily contradict Levy's statements, and this is therefore simply not a

situation analogous to In re U.S. Office Prods. Co. Sec. Litig., 251 F. Supp. 2d at 105.

      In order to state a claim for fraud or securities fraud the "plaintiffs' allegations must

indicate that their reliance on the allegedly fraudulent representation was reasonable." One-O-

One Enter., Inc. v. Caruso, 848 F.2d 1283, 1286 (D.C. Cir. 1988).  While the reasonableness of

the reliance can be an issue of fact that should be left for a jury, see In re DaimlerChrysler AG

Sec. Litig., 294 F. Supp. 2d 616, 622 (D.Del. 2003), dismissal for failure to state a claim is

proper when no reasonable person would have relied on the representation.  Alicke v. MCI

Comm. Corp., 111 F.3d 909, 912 (D.C. Cir. 1997).  "The determination of reasonable reliance

must 'be made on a case-by-case basis based on all of the surrounding circumstances." In re

DaimlerChrysler, 294 F. Supp. 2d at 620 (quoting AES Corp. v the Dow Chemical Co., 325 F.3d

174, 179 (3d Cir. 2003)).  As the Third Circuit has recognized, "the absence of reasonable

reliance 'is in the nature of an affirmative defense,' and therefore, the defendant bears the burden

of establishing that the plaintiff's reliance was unreasonable." Id. (quoting Straub v. Vaisman &

Co., 540 F.3d 591, 598 (3d Cir. 1976)).

      Contrary to the defendants' assertions otherwise, it was entirely reasonable for the

plaintiffs to have relied on both the Contracts Statements and the statements by Levy, neither of

which contradict the other.  The defendants seem to argue that because Levy said Phoenix would

be receiving income from contracts, but the Contracts Statements were devoid of support for that

statement, there is a contradiction.  Defs.' Mem. at 24-25.  The defendants, however, have

apparently failed to adequately examine the complaint and place the various factual allegations in

their proper spacial context.  For example, in February 2002, Rolinski, based upon

representations from Levy regarding the Border Contract, purchased 2000 shares of Phoenix

stock.  Compl. ¶¶ 40-42.  The representations by Levy did not contradict the 2001 Contracts

Statement, as it did not contain current information and it was therefore reasonable for Rolinski

to rely on the Levy statements over a financial statement that was more than eight months old.

Moreover, it was impossible for Levy's statements to conflict with the May 2002 Contracts

Statement as it had not yet been issued.  A second example further illustrates this point.  In May

2002, Zawatsky received the PPM, the September 2001 Contracts Statement, and the May 2002

Contracts Statement.  Id. ¶ 46.  Following receipt of these documents, Levy stated that the blue-

highlighted items on the Contracts Statements were "done deals" with a 100% probability of

performance.  Id. ¶ 49.  The Contracts Statements did not contradict these statements.  Rather,

the Contracts Statements clearly stated that the Blue Contracts were "Signed Contracts."

Compl., Ex. 2.  If anything, Levy's statements corroborated the information contained in the

Contracts Statements.[11]  Moreover, it is clear that the Contracts Statements were reflective of the

progress of various contracts on the dates when the statements were created.  It is not unusual for

documented information to become outdated quickly, and thus it was reasonable to rely upon the

current information that had been provided by Levy.  Thus, the very facts pled in the complaint

undercut the defendants' argument.  Moreover, it appears that the Egypt Contract was allegedly

signed after the August 2002 Contracts Statement was issued and therefore it cannot be said that

---

[11]  The fact that many of the contracts highlighted in blue had not yet generated any revenue at the time the
Contracts Statements were issued is immaterial.  As this Court will discuss later in this opinion, it is clear that the
lack of revenue from the contracts is not the basis for the plaintiffs' claim, but rather the alleged misrepresentations
concerning what contracts had already been signed.  Moreover, often a product must first be produced and shipped
before payment is tendered.  Thus, it is not unusual that a contract does not immediately generate revenue upon
ratification.

statements by Shuler in late August indicating that the Egypt Contract had been signed contradicted the 2002 Contracts Statement issued in early-August.  Compl. ¶¶ 66, 71-72.

Cases which support the defendants positions have simply been construing inapposite factual scenarios.  For example, in In re U.S. Office Prod. Co. Sec. Litig., 251 F. Supp. 2d at 104-05, the case relied upon by the defendants, another member of this Court concluded that the plaintiff had failed to demonstrate reasonable reliance when the plaintiff relied on oral statements which contradicted the express terms of a signed contract.  Id.  Here, there is no such written contract.  Rather, the document is a dated financial statement, which reasonably would be expected to change over time.  And the oral representations were purportedly based on current information.  Accordingly, this Court must conclude that the plaintiffs reasonably relied upon both the multiple Contracts Statements and the oral representations, as they did not necessarily contradict each other.

The defendants also posit that the plaintiffs have failed to plead reliance as to the IRS misrepresentation claim, which concerns alleged oral and written misrepresentations that Phoenix's unemployment taxes had been paid.  Defs.' Mem. at 25.  Specifically, the defendants argue that the plaintiffs "fail to indicate in any manner how the misrepresentation was material, or how any of the Plaintiffs reasonably relied upon the misrepresentation in making their investment decisions."  Id.  And they opine that "[i]n view of the allegations that Charles Levy misrepresented the existence and performance of hundreds of millions of dollars in contracts, it is unclear how a claimed two hundred thousand dollars would have been material to the decision to invest."  Id.  Other than these two purported inconsistencies, the defendants put forth no legal argument in support of their position.  And the argument on this point fails for the same reasons

17

the defendants' other lack of reliance arguments had to be rejected.  Namely, the financial

statements which indicated that Phoenix had failed to pay payroll taxes was issued prior to any of

the alleged misrepresentations made by Levy or Shuler.  Compl. ¶¶ 88-90.  Thus, it was entirely

reasonable for the plaintiffs to reply on later representations that the tax delinquency had been

resolved.[12]

    (3)    <u>Have the Plaintiffs Properly Pled Scienter?</u>

The defendants next opine that the plaintiffs have failed to properly plead scienter.  Defs.'

Mem. at 25-28.  Specifically, the defendants argue that as to the various contract

misrepresentations, the plaintiffs "make only general assertions that Defendants Phoenix and

Shuler had scienter."  <u>Id.</u> at 27.  And, the defendants posit, "[a]s to the IRS Misrepresentation,

there is not even a general assertion that there was scienter."  <u>Id.</u>  Thus, the defendants contend

that the plaintiffs' mere conclusory allegations of scienter are simply insufficient to support their

securities fraud claim.  <u>Id.</u>  On the other hand, the plaintiffs argue that they have sufficiently pled

scienter by referencing in their complaint the alleged oral and written misrepresentations of the

defendants, which "easily surpass standards of recklessness."  Pls.' Opp'n at 37.

"Scienter is a required element that must be pled in alleging a violation of § 10(b)."  <u>In re</u>

<u>Bann</u>, 103 F. Supp. 2d at 19.  However, the Exchange Act requires that plaintiffs plead with

particularity "facts giving rise to a strong inference that the defendant acted with the requisite

---

      [12]   The defendants also posit that "[i]n view of the allegations that Charles Levy misrepresented the
existence and performance of hundreds of millions of dollars in contracts, it is unclear how a claimed
misrepresentation of two hundred thousand dollars would have been material to the decision to invest."  Defs.' Mem.
at 25.  However, at this stage in the litigation, this Court must read the facts in the complaint in the light most
favorable to the plaintiffs.  As such, the defendants' purported representation concerning payment of the
unemployment taxes must be considered material to the plaintiffs' decision to make their investments and this
conclusion is not undercut by the fact that the plaintiffs also allegedly relied upon the representations about the
number of signed contracts Phoenix had secured.

state of mind." 15 U.S.C. § 78u-4(b)(2).  Courts are split as to how a "strong inference" of

scienter may be established.  For example, the Third Circuit, adopting the Second Circuits pre-

PSLRA standard, concluded that the PSLRA requires that the facts demonstrate "a 'strong

inference' of defendant's fraudulent intent."  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 532-

35 (3d Cir. 1999).  Under this standard, scienter has been sufficiently pled if the plaintiffs  "(a)

allege facts to show that defendants had both motive and opportunity to commit fraud or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).  In fact, the

Second Circuit has noted that "the PSLRA effectively raises the nationwide pleading standard to

that previously existing in this circuit and no higher (with the exception of the 'with particularity'

requirement)."  Novak, 216 F.3d at 310.  Nonetheless, the Second Circuit concluded that

"Congress's failure to include language about motive and opportunity suggest that we need not

be wedded to these concepts in articulating the prevailing standard."  Id.  Other Circuit Courts,

however, have concluded that the PSLRA "strengthens the old Second Circuit standard by

rejecting the simple pleading of motive and opportunity."  In re Interbank Funding Corp. Sec.

Litig., 329 F. Supp. 2d 84, 90 (D.D.C. 2004) (citing Bryant v. Avado Brands, Inc., 187 F.3d

1271, 1283 (11th Cir. 1999); In re Silicon Graphics, 183 F.3d 970, 975 (9th Cir. 1999); In re

Comshare, Inc. Sec. Litig., 183 F.3d 542, 550-51 (6th Cir. 1999)).   The District of Columbia

Circuit has not yet provided guidance on this issue.  In re Interbank Funding Corp. Sec. Litig.,

329 F. Supp. 2d at 90.

Under the "motive and opportunity test," it has been held that scienter is properly alleged

when a complaint posits that the defendants "(1) benefitted in a concrete and personal way from

the purported fraud . . .; (2) engaged in deliberately illegal behavior . . .; (3) knew facts or had

access to information suggesting that their public statements were not accurate . . .; or (4) failed

to check information that they had a duty to monitor." Novak, 216 F.3d at 311. It also has been

held that scienter can be established by setting forth "facts that constitute circumstantial evidence

of either reckless or conscious behavior." In re Advanta, 180 F.3d at 534-35. The second of the

two tests requires a reckless statement, which is a "statement . . . involving not merely simple, or

even inexcusable negligence, but an extreme departure from the standards of ordinary care, and

which presents a danger of misleading buyers or sellers that is either known to the defendant or is

so obvious that the actor must have been aware of it." Id. at 535 (quoting McLean v. Alexanders,

599 F.3d 1190, 1197 (3d Cir. 1979) (internal quotation marks omitted)). No matter which of the

two standards cited above is applied, it is well established "that a pleading of scienter may not

rest on a bare inference that a defendant 'must have had knowledge of the facts.'" In re Advanta,

180 F.3d at 539 (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 26 (1st Cir. 1992)).

Here, the plaintiffs contend that their complaint makes clear that Phoenix "published

statements when they knew facts or had access to information suggesting that their public

statements were inaccurate." Pls.' Opp'n at 37; see Compl. ¶¶ 42, 52-55, 69, 80. Thus, posits

the plaintiffs, these false statements, were, at a minimum, reckless statements that demonstrate

scienter. Pls.' Opp'n at 37. Moreover, the plaintiffs opine that they have also demonstrated

sufficient motive and opportunity, as their complaint clearly states that Shuler had "an improper

motive to mislead Plaintiffs, including the desire to maximize his personal profit from

Phoenix . . . ." Id. at 38 (quoting Compl. ¶ 101).

The plaintiffs' allegations of motive and opportunity are simply insufficient to

demonstrate scienter.  It is well-settled that "motive-and-opportunity allegations of scienter anchored merely in a defendant's profit motive" are simply insufficient to survive a dismissal motion.  In re Internbank Funding Corp Sec. Litig., 329 F. Supp. 2d at 90 (citing In re Digital Island, 357 F.3d at 31-32; In re Baan Co. Sec. Litig., 103 F. Supp. 2d at 20; Vogel v. Sands Bros. & Co., Ltd., 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001); Chill v. Gen'l Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996)).   Admittedly, the Eighth Circuit recognized in Fl. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 661 (8th Cir. 2001) that a large compensation package, "together with the timing coincidence of an overstatement of earnings at just the right time to benefit [the defendant], provides an unusual, heightened showing of motive to commit fraud." Id.  However, the plaintiffs' reliance on Fl. State Bd. of Admin. is misplaced.  Here the plaintiffs' allegations regarding motive and opportunity amount to nothing more than Shuler's attempt to minimize his personal liability and risk, and maximize his personal profits.  Pls.' Opp'n at 38. As noted above, this amounts to nothing more than allegations of profit motive, which are insufficient to demonstrate scienter based on the motive and opportunity theory.  Moreover, there is simply nothing so unusual or coincidental about the circumstances in this case which warrant application of the exception to the general rule articulated in Fl. State Bd. of Admin.

_____Whether recklessness has been adequately pleaded, however, is a much closer question. On this point, the plaintiffs allege that scienter is demonstrated in their complaint through the allegations that the defendants published statements and made oral misrepresentations when they had facts or access to information suggesting that the public statements were inaccurate.  Pls.' Opp'n at 37 (citing Compl. ¶¶ 16, 32-40, 43-44, 48-55, 57, 59, 60, 63, 75, 78).  The defendants counter that these are merely conclusory allegations, and therefore are insufficient to demonstrate

scienter.  Defs.' Mem. at 27.  "One of the classic fact patterns giving rise to a strong inference of

scienter is that defendants published statements when they knew facts or had access to

information suggesting that their public statements were materially inaccurate."  Fl. State Bd. of

Admin., 270 F.3d at 665; see also In re Interbank Funding Corp. Sec. Litig., 329 F. Supp. 2d at

91-92 (recognizing that "a strong inference of scienter may be established 'where the complaint

sufficiently alleges that the defendants . . . failed to check information they had a duty to

monitor.'").

     Here, the plaintiffs have put forth much more than conclusory allegations that the

defendants published statements and made oral representations that were false.  For example, the

plaintiffs contend that the defendants misrepresented that Phoenix had received a contract with

the Immigration and Naturalization Service ("INS").  Compl. ¶ 40.  Rather than merely stating

that this was a false representation, the plaintiffs clearly lay out why they believe it was false,

noting that after making this representation, Shuler also wrote that "[Phoenix] is in final

negotiations to supply our sensors to assist in the monitoring of the southern and northern

borders of the United States."  Id. ¶ 42 (emphasis in original).  Thus, the plaintiffs allege that the

Border Contract had not in fact been signed when the earlier statement to the contrary was made.

This is not a conclusory allegation.  Similarly, the plaintiffs allege that they were informed about

a "billion dollar contract" to provide services to Egypt.  Id. ¶¶ 66, 72.  To support the falsity of

this representation, the plaintiffs point to an investor update letter, issued after the alleged

misstatements,  stating that "[Phoenix has] submitted all of the required information to the

[Egyptian] Ministry of Interior and are waiting as the project moves through their bureaucracy in

order for it to receive all of the required approvals."  Id. ¶ 69.  With both of these examples, the

plaintiffs have clearly demonstrated that at the time the initial representations were made

concerning the contracts, they were not in fact signed or finalized, thus lending credence to the

plaintiffs' allegations that the defendants were aware of the falsity of their initial statements.

Thus, it is certainly reasonable to conclude from these facts that at the time the initial

misrepresentations were made, Levy and Shuler were aware that the contracts had not been

signed.  Clearly, these are not the type of conclusory allegations that warrant dismissal of this

claim for failure to plead scienter.  The claims specifically detail the specific transaction, i.e., the

INS misrepresentation and the Egypt misrepresentation, and they specify that the defendants had

the requisite information available to them to appreciate that the statements were false.

Compare In re Interbank Funding Corp., 329 F. Supp. 2d at 91-92.  Because the defendants

contend that they relied heavily on the statements in Addendum E, the PPM, and the various

Contracts Statements used to solicit investors, there is a strong inference that the defendants were

aware of the misrepresentations in these statements.  See In re Baan, 103 F. Supp. 2d at 21-22.

These facts alone support the conclusion that the plaintiffs have sufficiently pled scienter as to

the alleged contract misrepresentations.[13]

      However, the plaintiffs have failed to sufficiently plead scienter as to the claims regarding

the IRS misrepresentation.  In this regard, the plaintiffs merely state that the defendants

"knowingly and with intent to deceive, failed to disclose to Plaintiffs that Phoenix had been, and

continued to be, subject to substantial [IRS] tax deficiencies."  Compl. ¶ 17; Pls.' Opp'n at 37 n.

35.  This amounts to nothing more than a conclusory allegation, and clearly does not meet the

---

[13]  The defendants, in their reply, state that "the misrepresentations in the Amended Complaint are largely attributed to Levy, who is not a defendant, and the Amended Complaint is devoid of any allegation or factual support to show that Levy was acting as Defendants' agent . . . ."  Defs.' Reply at 20.  This argument does not accurately reflect the record.  See Compl. ¶ 10 (alleging that Levy is an agent of Phoenix).

requisite standard for pleading particularity as required by Rule 10b-5.  Accordingly, this portion

of the securities claim is subject to dismissal.  However, the Court will provide the plaintiffs an

opportunity to file an amended complaint to cure this defect, as well as others identified

hereafter.

      (4)     <u>Are the Alleged Misrepresentations Forward-Looking?</u>

The PSLRA established a "safe harbor" provision shielding forward-looking statements

from liability under Rule 10b-5.  15 U.S.C. § 78u-5.  This safe harbor provision shields

"forward-looking statements" from Rule 10b-5 liability where such a statement is made by a

"natural person" unless plaintiffs prove that it was made with "actual knowledge . . . that the

statement was false and misleading."  15 U.S.C. § 78u-5.  A forward-looking statement is:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).  The District of Columbia Circuit has noted that "[f]inancial projections

24

and generalized statements of optimism represent management's opinion of how the company is

expected to perform within a defined time frame.  Such projections are not guarantees of future

financial performance, nor are they understood as such by reasonable investors."  Kowal, 16 F.3d

at 1276 (citing Raab v. General Physics Corp., 4 F.3d 286 (4th Cir. 1993); In re Verifone Sec.

Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993)).  Thus, the

Circuit Court has concluded that "projections and statements of optimism are false and

misleading for the purposes of the securities laws if they were issued without good faith or lacked

a reasonable basis when made."  Id. at 1276.  Further, when "plaintiffs seek to base a claim of

securities fraud on false and misleading projections or statements of optimism, their complaint

must also plead sufficient facts that if true would substantiate the charge that the company lacked

a reasonable basis for its projections or issued them in less than good faith."  Id. (citing Roots

P'ship v. Lands' End, Inc., 965 F.2d 1411, 1419 (7th Cir. 1992); In re Trump Casino Sec. Litig.,

7 F.3d 357, 373 n.17 (3d Cir. 1993); Raab, 4 F.3d at 288; In re Verifone, 784 F. Supp. at 1487).

The Court's analysis must not focus solely on the form of the communication, but rather, must

address the substances of the communication.  Isquith v. Middle South Utilities, Inc., 847 F.2d

186, 203 (5th Cir. 1988).  Accordingly, whether liability under the securities law can be imposed

for a forward-looking or predictive statement "does not turn on whether the prediction in fact

proved to be wrong; instead, falsity is determined by examining the nature of the

prediction—with the emphasis on whether the prediction suggested reliability, bespoke caution,

was made in good faith, or had a sound factual or historical basis."  Id. at 204.

 The defendants argue that the plaintiffs' securities fraud claim must be dismissed because

"[t]he only stated basis for the claim of misrepresentation is [the] Plaintiffs' claim that the actual

performance of Phoenix was substantially lower" than what was represented in the PPM, Addendum E and the multiple Contracts Statements.  Defs' Mem. at 28.  The plaintiffs' position, the defendants opine, fails to make out a claim for securities fraud because there is no allegation that the statements were issued without good faith or a reasonable basis.  Id. at 29.  The plaintiffs contend, however, that this is not a case about misrepresentation of financial projections, but rather their securities fraud claim is based upon the misrepresentation about the number of signed contracts Phoenix had procured.  Pls.' Opp'n at 33.  Moreover, the plaintiffs posit that even if these statements upon which they relied are properly characterized as forward-looking statements, because they contained no cautionary statements, they are not properly characterized as forward-looking statements.  Id. at 34.  Thus, the plaintiffs argue that their securities fraud claim is not defective in this regard.

Construing the complaint in the light most favorable to the plaintiffs, as this Court must do, it is clear that the plaintiffs predicate their securities fraud claims not on misrepresented projected revenue, as the defendants contend, but rather on the fact that Phoenix allegedly misrepresented that various contracts had been signed.  Compl. ¶¶ 39, 43 63 (identifying various contracts that had allegedly been signed), 40 (noting that the Border contract had allegedly been signed), 66 (noting that the Egypt contract had allegedly been signed).  It is clear that the crux of the plaintiffs' complaint is that they were induced into purchasing stocks after learning that a number of contracts had purportedly been signed, not that they were induced based upon the projected revenue from those contracts.[14]  Statements, either written or oral, indicating that a

---

[14] It is clear to this Court that if the plaintiffs' position was predicated upon the failure to realize the financial gains indicated in the PPM, Addendum E, or the Contracts Statements, their securities fraud claim would not be actionable as these are clearly forward-looking statements of anticipated revenue sources, and the plaintiffs

(continued...)

contract has been signed is not a forward-looking statement or a statement of prediction, rather, they are statements of the present business condition of the company. Clearly, these types of statements do not fit into any of the categories of forward-looking statements described in the safe-harbor provision. See 15 U.S.C. § 78u-5(i)(1). Thus, the defendants' argument in this regard has no merit.[15]

In sum, the Court concludes that the plaintiffs have, in large part, sufficiently plead a securities fraud claim. As to that aspect of the claim that was not properly pled, the Court will afford the plaintiffs the opportunity to attempt to cure the defect.

**(B)      The Plaintiffs' Common Law Fraud and Negligent Misrepresentation Claims**

The defendants also argue that the plaintiffs have failed to sufficiently plead common law fraud and negligent misrepresentation in counts two and three of their complaint. Defs.' Mem. at 30. The plaintiffs common law fraud and negligent misrepresentation claims are predicted on the same facts as their securities fraud claim. Compare Compl. ¶¶ 97-101, with Compl. ¶¶ 106-117. Moreover, the arguments raised by the defendants here are identical to the arguments asserted by the defendants in support of their attempt to demonstrate deficiencies in the pleading of the plaintiffs' securities fraud claim. Defs.' Mem. at 31-34 (arguing that the plaintiffs have failed to plead with sufficient specificity, failed to establish reasonable reliance, and failed to demonstrate

---

[14](...continued)
have not asserted any factual support for the proposition that these financial projections were made in bad faith or without a reasonable basis. See Kowal, 16 F.3d at 1276.

[15]   Because this Court has concluded that the plaintiffs' securities fraud claim survives the defendants' dismissal motion, it need not consider the defendants' contention that this Court lacks subject matter jurisdiction over Warriener and Rolinski's state law claims. Defs.' Mem. at 30 (noting that if the Court dismisses the securities fraud claim it should then dismiss Wariner and Rolinski's common law claims for lack of subject matter jurisdiction).

the requisite scienter).  In fact, the defendants direct this Court to the arguments raised in that

section of their motion to support their arguments directed to these two claims.  Id.  Thus, just as

the defendants' attempt to have the plaintiffs' securities fraud claim dismissed has been rejected,

so too must their attempt to have the plaintiffs' common law fraud and negligent

misrepresentation claim dismissed.

The PSLRA imposes a pleading standard that exceeds that required to establish a claim

for common law fraud[16] or negligent misrepresentation.[17]  Rogers, 268 F. Supp. 2d at 1310 n.9.

Moreover, the defendants concede that the plaintiffs' negligent misrepresentation claim is not

governed by Rule 9 of the Federal Rules of Civil Procedure, but rather by Rule 8's requirement

that the complaint set forth a short and plain statement of the claim.  Defs.' Reply at 25.  Thus,

because this Court has concluded that the plaintiffs have satisfied the heightened pleadings

requirements of the PSLRA and Rule 9, the defendants' attack on the plaintiffs' common law

fraud and negligent misrepresentation claims as they relate to the alleged contract

misrepresentations must also be rejected.  However, as previously noted, the plaintiffs' common

---

[16]  To establish a common law fraud claim, a plaintiff must allege with particularity that: (1) the defendant made a false representation; (2) the representation was in reference to a material fact; (3) the defendant had knowledge of its falsity; (4) the defendant intended to deceive (scienter); (5) the plaintiff acted in reliance on the misrepresentation; and (6) the reliance was reasonable.   In re U.S. Office Prod. Co. Sec. Litig., 251 F. Supp. 2d at 100.  As previously discussed, the plaintiffs have failed to properly allege facts with the particularity necessary to plead scienter as to the IRS misrepresentation claim.  For the same reasons identified in the previous section of this opinion where that deficiency was addressed, this aspect of the plaintiffs' common law fraud claim is subject to dismissal as well.  But as with the securities fraud claim, the Court will afford the plaintiffs the opportunity to cure the defect.

[17]  To establish a claim of negligent misrepresentation, the plaintiffs must plead, in accordance with Rule 8, that (1) the defendants made a false statement or omission of a fact; (2) the statement was a violation of a duty to exercise reasonable care; (3) the false statement or omission involved a material issue; (4) the plaintiffs reasonably relied to their detriment on the false information; and (5) the defendants' challenged conduct proximately caused injury to the plaintiffs.  Burlington Ins. Co. v. Okie Dokie, Inc., 329 F. Supp. 2d 45, 48 (D.D.C. 2004).  Because negligent misrepresentation does not require a showing of scienter, the IRS misrepresentation claim pled as part of this common law cause of action is not deficient.

law fraud claim, as it related to the alleged IRS misrepresentation, is defective and the plaintiffs'
will be given the opportunity to cure this defect.

**(C)      The Plaintiffs' Breach of Fiduciary Duty Claim**

The defendants contend that the plaintiffs' complaint is silent as to the basis for any
alleged breach of a fiduciary duty, the claim contained in count five of the complaint, and
therefore demand dismissal of this count.  Defs.' Mem. at 34.  Moreover, the defendants posit
that under the common-law of the State of Maryland there is no "independent cause of action for
breach of fiduciary duty."  Id.  The defendants clarify their argument in their reply, noting that
they are not contending that the plaintiffs "have no right to bring an action against Defendants
individually," rather they posit that "when an investor makes a claim of injury against a
corporation, if the injury is not distinct to any particular shareholder, the action is derivative."
Defs.' Reply at 26.  Thus, according to the defendants, because the plaintiffs' breach of fiduciary
duty claim is not distinct from claims that could be raised by any other shareholder, the breach of
fiduciary duty claim should be brought as a shareholder derivative action.  The plaintiffs counter,
arguing that under either Florida, Maryland, or District of Columbia law, breach of fiduciary duty
claims can be direct, as opposed to derivative actions.  Pls.' Opp'n at 42-43.

By relying on Hodges v. Buzzeo, 193 F. Supp. 2d 1279, 1288 (M.D. Fla. 2002), the
defendants appear to be arguing that the plaintiffs do not have standing to bring a breach of
fiduciary duty action.  The district court in Hodges held that plaintiffs were prohibited from
bringing a direct or individual claim for breach of fiduciary duty if the same cause of action could
be brought as a shareholder derivative suit.  Id. at 1288.  Specifically, the Hodges court noted:

>An action brought by a stockholder is derivative if the gravamen of the complaint is
>injury to the corporation or to the whole body of its stock or property and not injury to the

> plaintiff's individual interest as a stockholder.  Conversely, direct action, or as some prefer, an individual action, is a suit by a stockholder to enforce a right of action existing in him. What these definitions attempt to convey is that a stockholder may bring suit in his own right to redress an injury sustained directly by him, and which is separate and distinct from that sustained by other stockholders. If, however, the injury is primarily against the corporation, or the stockholders generally, then the cause of action is in the corporation and the individual's right to bring it is derived from the corporation.

Id. (quoting Alario v. Miller & Miller, 354 So.2d 925, 926 (Fla. Dist. Ct. App. 1978)).  The

District of Columbia Circuit has a similar standard.  In Cowin v. Bresler, 741 F.2d 410 (D.C. Cir.

1984), the Circuit Court held that "[c]laims of corporate mismanagement must be brought on a

derivative basis because no shareholder suffers a harm independent of that visited upon the

corporation and the other shareholders."  Id. at 414.  Thus, the Circuit Court requires "derivative

enforcement of claims belonging in the first instance to the corporation . . . ."  Id.  However, just

as the district court in Hodges noted, there are exceptions to this rule when there is a "special

injury" to a stockholder.  Hodges, 193 F. Supp. 2d at 1288.  Such "special injury" includes

situations  "where the allegedly wrongful conduct violates a duty to the complaining shareholder

independent of the fiduciary duties owed that party along with all other shareholders, or, where

the conduct causes an injury to the shareholder distinct from any injury to the corporation itself."

Cowin, 741 F.2d at 415. "In cases of the first sort, the complaining shareholder may sue as an

individual only because he stands, and has been injured in his relationship to the corporation, in a

capacity other than that of a shareholder."  Id. "The second category of harms which may be

remedied on an individual basis consists of 'wrong[s] inflicted upon [the stockholder] alone . . .

or wrong[s] affecting . . . the stockholders and not the corporation . . . .'"  Id. (citation omitted).

Here, the defendants opine that the plaintiffs' breach of fiduciary duty claim is not

distinct from any particular shareholder and thus must be brought as a derivative action.  To

support this claim, they cite to paragraphs 129-132 of the complaint.  Defs.' Reply at 26.  These

paragraphs of the complaint state that the defendants breached their fiduciary duty by failing to

secure the income from the contracts listed in the PPM, Addendum E, and the various Contracts

Statements.[18]  Clearly, allegations of failure to secure revenue represent injury to the corporation

as a whole, as opposed to an individual shareholder.  This is certainly not the type of claim that

warrants an individual or direct cause of action.  See Cowin, 741 F.2d at 416 (concluding that

claims that the defendants "enter[ed] into a series of 'unfair' transaction that have 'involved self-

dealing' and 'diverting assets' are fundamentally claims belonging to the corporation and to [the

plaintiff] only derivatively.").  Rather, they are clearly claims that must be alleged in a

shareholder derivative suit.  Accordingly, they cannot form the basis for the breach of fiduciary

duty claim the plaintiffs seek to pursue.  However, there are many other allegations in the breach

of fiduciary claim that have not been challenged by the defendants.  Accordingly, rather than

dismissing this claim in its entirety, the Court will only dismiss those portions of the breach of

fiduciary duty claim that have been specifically challenged.[19]

---

[18]  Because the defendants only specifically reference these paragraphs, it appears that they do not argue that the other allegations giving rise to the breach of fiduciary duty claim mandate dismissal of this claim.  See, e.g., Compl. ¶¶ 118-128, 133.  Since those paragraphs are not challenged, the Court will not analyze them.  However, the Court notes that it would appear that because those allegations deal with representations made to individual investors to induce them to purchase Phoenix stock, they amount to claims of harm that inflicted "direct injury" on each individual stockholder. Cf. Hodges, 193 F. Supp. 2d at 1289.

[19]  The defendants also posit that, under Maryland law, a claim for breach of fiduciary duty cannot be pursued as a separate claim.  In McGovern v Post, 2004 WL 1764088, at *12 (D.Md. 2004), the district court concluded that based upon Maryland law, a "breach of fiduciary duty can give rise to a cause of action—that is, it can be a component of a cause of action—but it cannot be a cause of action standing alone." Id.  Thus, in that case, because the breach of fiduciary duty claim was pled as a separate count, it was dismissed.  At this stage in the litigation, without discovery having been conducted, it is premature to dismiss the breach of fiduciary duty count entirely because it is unclear to the Court which State's laws will govern the sustainability of this claim.  In fact, it appears to the Court that the parties, by citing to Maryland, District of Columbia, and Florida cases, are unclear about this question as well.  See, e.g., McGovern, 2004 WL 1764088, at *13.

**(D)      The Plaintiffs' Blue Sky Law Claim**

The defendants allege that the plaintiffs' Blue Sky laws claim under District of Columbia and Maryland law should be dismissed for several reasons.   First, the defendants opine that the District of Columbia component of the claim should be dismissed because (1) the District of Columbia Code provision upon which the plaintiffs rely has been repealed, Defs.' Mem. at 35; and (2) the new version of the Code "does not share a lineage with the repealed provision." Defs.' Reply at 27.  In addition, the defendants assert that the plaintiffs fail to state a basis for making a claim against Phoenix, as opposed to Shuler, under Maryland law.  Defs.' Mem. at 35. Specifically, the defendants argue that the complaint is void of any alleged misrepresentations made by the corporation to make it liable under the Blue Sky laws.  Defs.' Reply at 28.  In response, the plaintiffs note that the District of Columbia Blue Sky laws were recodified in 2000 at D.C. Code § 31-5601 (2001), and thus, the defendants' attack on this aspect of the claim is meritless.  Pls.' Opp'n at 43.  And in regard to the Maryland law portion of the claim, the plaintiffs note that MD Code Ann. Corps. & Ass'ns, § 11-101 (1999), which defines "persons" under Maryland securities law, includes corporations.  Id.

There can be no dispute that D.C. Code § 2-2602 (1983), the provision upon which the plaintiffs rely in their complaint for this claim, no longer exists.  The District of Columbia Council enacted the "Securities Act of 2000," which substantially altered the District of Columbia securities law.  Pursuant to this new legislation, D.C. Code § 2-2602 was repealed, see D.C. Code § 2-2603 (1983), and recodified at D.C. Code § 3-3602 (2001).  The plaintiffs' reliance on a repealed provision of the District of Columbia Code is troubling in two respects.  First, by failing to identify the proper code provision of the District of Columbia Code, they have unreasonably

32

burdened the defendants in their attempt to identify the basis for the District of Columbia component of the claim.  Second, and more troubling, is the fact that by relying on the repealed provision, and an outdated version of the Code, the plaintiffs have obviously failed to examine their allegations under current law.  Nonetheless, this Court cannot conclude that the plaintiffs' failings warrant dismissal of this component of the claim.  Rather, since this Court is permitting the plaintiffs leave to file an amended complaint to address other pleading defects, when filing their amended complaint, they may seek to correct this error as well.

The defendants' argument regarding Maryland Blue Sky Laws warrants little attention. Here, they allege that there are no allegations in the complaint that Phoenix made any misrepresentations.  Defs.' Mem. at 35; Defs.' Reply at 28.  This argument simply ignores the allegations that both Shuler and Levy were allegedly acting as agents of Phoenix when the alleged misrepresentations occurred.  Compl. ¶¶ 6, 8, 10.  Because an agent can bind a corporation to an agreement, statements made by an agent can be attributed to the corporation.  See, e.g., Wyant v. Burlington N. Santa Fe R.R., 210 F. Supp. 2d 1263, 1293 (N.D. Ala. 2002) (noting the "basic agency principles that 'attribute the acts of agents of a corporation to the corporation, so that all of their acts are to be those of a single legal actor.'").  Thus, the defendants' demand for dismissal of the Maryland law component of this claim must be rejected.

**(E)     The Plaintiffs' Receivership Request**

The defendants argue that this request (Count six) should also be dismissed on several grounds.  Defs.' Mem. at 35.  First, the defendants opine that, "[a]s with the claim for breach of fiduciary duty, Plaintiffs have ignored the requirements of a Receivership under Florida law and have failed to follow the strict procedures required before bringing a shareholder derivative

action; something which would be a prerequisite to seeking a Receivership." Id. at 35. In

opposition, the plaintiffs rely upon Cowin v. Bresler, 741 F.2d 410 (D.C. Cir. 1984). There, the

District of Columbia Circuit noted that a plaintiff's request for a "receiver to liquidate the

company, as distinct from his state law claims for damages and injunctive relief, was properly

before the district court in a personal action." Id. at 417. Nevertheless, here, for several reasons

the plaintiffs' receivership claim is flawed.

This Court has already concluded that the plaintiffs do not need to bring a derivative

action to vindicate their rights, as many of their claims can properly be pursued as an independent

or direct lawsuit. Thus, the defendants' shareholder derivative action prerequisite argument has

no merit. However, it is equally clear that the plaintiffs have failed to properly plead a claim for

the appointment of a receiver.[20] "To establish a claim for a court-appointed receiver, [the

plaintiff] must allege facts to show that the majority shareholders or directors of the company

have engaged in, or are presently engaged in, fraudulent misconduct which puts the company at

immediate risk of great loss." Id. Moreover, a "request for a court-appointed receiver 'to wind

up a solvent going business is rarely granted . . . . '" Id. (quoting Berwald v. Mission Dev. Co., 40

Del. Ch. 509, 512 (Sup. Ct. 1962)). Under Florida law, a receiver will not be appointed unless

there are allegations that the defendant is insolvent. See Jones v. Harvey, 82 So.2d 371 (Fla.

1955). Under either standard, the plaintiffs fail to allege sufficient facts to avoid dismissal. First,

while the plaintiffs have alleged fraudulent misconduct, they have failed to allege that the

---

[20]   In determining what standard to apply in reviewing the adequacy of this claim, the Court must rely on
state law, as opposed to federal law. As the District of Columbia Circuit noted in Cowin, "[i]n our view, the
propriety—in a diversity suit—of appointing a receiver to liquidate a business organized under state law grounds a
substantive right that should be determined by reference to state law. Cowin, 741 F.2d at 417 n.8. Because this
claim is based on state law grounds, the Court must apply state law.

company is at great risk of insolvency.  Moreover, simply alleging misconduct does not mandate a

conclusion that immediate risk of great loss will follow.  Thus, the plaintiffs' receivership claim

must fail.  As with the other deficiencies, the Court will provide the plaintiffs an opportunity to

file an amended complaint to cure this defect.

**(F)     The Plaintiffs' Claim for Injunctive Relief**

Finally, the defendants opine that the plaintiffs' claim for injunctive relief should be

dismissed because it is not properly pled.  Defs.' Mem. at 36.  In support of this position, the

defendants cite to Federal Rule of Civil Procedure 65 and W. Publ'g Co. v. Mead Data Ctr., Inc.,

799 F.2d 1219, 1229 (8th Cir. 1986).  Id.  Specifically, the defendants opine that the plaintiffs

have failed to allege "the existence of an irreparable injury and the absence of an adequate remedy

at law."  Defs.' Reply at 29.  The defendants reliance on West Publishing and Rule 65 is

confounding and demonstrates a complete misunderstanding of "injunctive relief" and the request

for a "preliminary injunction."  West Publishing addresses the factors a Court must consider when

determining whether a Court should grant a motion for a preliminary injunction, i.e., prejudgment

relief.[21]  Moreover, Rule 65, details the process through which a party can seek a preliminary

injunction or a temporary restraining order.  See Fed. R. Civ. P. 65(a)-(b).  This legal support is

simply inapposite.  Here, the plaintiffs are not seeking a preliminary injunction, but rather are

asking this Court for injunctive relief if they succeed on the merits of their claims, i.e., post

judgment relief.  Compl. at 39.  Rather than pleading the four-part test enunciated in West

---

[21]  The District of Columbia Circuit has also issued numerous opinions detailing this standard.  It is unclear why the defendants do not cite to any of them in a case that has been brought in this Circuit.  See, e.g., Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C. Cir. 1989); Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958).  Of course, if the plaintiffs file a motion for a preliminary injunction, they would be required to satisfy the standard enunciated in these cases.

Publishing, or analogous cases from this Circuit, when a plaintiff seeks post-judgment injunctive relief, he must simply "plead and . . . prov[e] facts which show, that he has no adequate remedy at law." United Protective Workers of Am. v. Ford Motor Co., 194 F.2d 997, 1001 (7th Cir. 1952). And "[f]ederal courts have long recognized that [section 10b and Rule 10b-5] give rise to a private cause of action for damages and injunctive relief." Dabit v. Merill Lynch, Pierce, Fenner, & Smith, Inc., 395 F.3d 25, 32 (2d Cir. 2005). Moreover, the plaintiffs clearly posit that full disclosure of Phoenix's financial position is necessary in order for the plaintiffs to secure their rights as investors in Phoenix, and injunctive relief is the only means of securing such disclosure. Comp. ¶¶ 139-141. Accordingly, the defendants' challenge to the plaintiffs' claim for injunctive relief has no merit.

## VI.   Conclusion

Based upon the forgoing analysis, it is clear, with few exceptions, that the plaintiffs' complaint substantially complies with the requisite pleading requirements. Accordingly, this Court must grant in part, and deny in part the defendants' motion. However, rather than dismissing those defective claims, this Court will provide the plaintiffs an opportunity to file an amended complaint to cure the defects identified throughout this opinion, which the Court has indicated the plaintiff may attempt to cure.[22]

---

[22] Because this Court is granting the plaintiffs leave to file an amended complaint, this Court need not address the defendants' request for a more definite statement pursuant to Rule 12(E). Defs.' Mem. at 9-12. The Court assumes that the plaintiffs in their amended complaint will address any concerns that the defendants might have to make it easier for them to understand the allegations contained therein. However, if after the amended complaint is filed, the defendants continue to believe that the complaint is incomprehensible, they may again seek a motion pursuant to Rule 12(E).

**SO ORDERED** this day of 30th day of August, 2005.[23]

REGGIE B. WALTON
United States District Judge

---

[23] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.